UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

In re:

    Gradie C. Hubbard and
    Kimberly J. Hubbard (*deceased*),

        Debtors.

Case No. 16-23389-beh
Chapter 13

**DECISION AND ORDER ON DEBTOR'S MOTION TO REOPEN CASE**

    Debtor Gradie Hubbard filed a motion to reopen this case and to have this Court determine that the mortgage lien on his real estate located at 4321, 4327, & 4335 N. 35th St., Milwaukee, WI 53216 has been satisfied and should be released. The creditor holding the mortgage, Community Loan Servicing, LLC (f/k/a Bayview Loan Servicing, LLC) ("Community"), objected both to the case reopening and to any declaratory relief that would modify its rights under its mortgage or the corresponding note. For the following reasons, the Court denies the debtor's request to reopen this case.

## BACKGROUND

    The debtors[1] filed their Chapter 13 case on April 12, 2016. Their schedules disclosed monthly household income of $3,820.00 from rental properties (after deducting expenses which included $657 in property taxes and $233 in property insurance), $2,601.00 from Social Security, and $293.00 from a union pension plan. ECF No. 1, at 46–51. Both debtors listed their employment status as "not employed" and reported no employment income. *Id.* In total, the debtors disclosed receiving $6,714.00 per month in net income and $3,214.00 per month in household expenses, leaving $3,500.00 per month remaining. *Id.*

---

[1] Joint debtor Kimberly Hubbard died during the term of the parties' Chapter 13 plan but maintains a legal interest in the case and motion through her estate. *See* Fed. R. Bankr. P. 1016(b). This decision may refer to the "debtor" or "debtors" interchangeably.

The debtors' Chapter 13 plan called for payments to the Chapter 13 trustee of $3,500.00 per month for a term of 59 months. ECF No. 26. In relevant part, section 6(B) of the plan stated: "Debtor[s] will make all post-petition mortgage payments directly to each mortgage creditor as those payments ordinarily come due. These regular monthly mortgage payments, which may be adjusted up or down as provided for under the loan documents, are due . . . unless this Plan provides otherwise." ECF No. 3, at 4.

As to Community's secured claim (Claim No. 11), the debtors' plan invoked the "cramdown" option of 11 U.S.C. § 1325(a)(5)(B), which permits a debtor to keep property securing a creditor's claim if, among other things, the debtor pays the creditor the "allowed amount" of its secured claim under 11 U.S.C. § 506—i.e., the value of the property securing the claim—plus interest as necessary, in accordance with *Till v. SCS Credit Corp*, 541 U.S. 465 (2004). The debtors valued the real estate securing Community's claim at $115,000.00, *see* ECF No. 3, at 5, and proposed to pay this amount over the life of the plan (via the Chapter 13 trustee) with interest at 6% per annum, *see* ECF No. 24, at 3. The plan also included the following "Special Provision": "Upon completion of the plan and the granting of the Debtors' discharge, the mortgage lien of Bayview Loan Servicing, LLC shall be considered satisfied." ECF No. 3, at 5.[2]

The Court confirmed the debtors' plan on December 28, 2016. The Chapter 13 trustee certified that the debtors had made all plan payments due to the trustee as of November 22, 2022, *see* ECF No. 126, and the debtors received their discharges shortly after, *see* ECF Nos. 130 & 141. Then on January 4, 2023, the Clerk's office closed the case. ECF No. 143.

In early 2022, near the end of the plan term, a problem arose. Community asserted that it had been paying property tax, insurance, and other costs during the plan on behalf of the debtors, and these charges needed

---

[2] In a "cramdown" plan, where the debtor retains property serving as collateral on a claim without the consent of the secured creditor, the plan must permit the creditor to "retain the lien securing [its] claim" until the underlying debt is either paid in full or discharged. 11 U.S.C. § 1325(a)(5)(B)(i).

to be cured for the plan to complete. *See* ECF No. 105, at 2.[3] On June 15, 2022, Community filed this as a (supplemental) proof of claim, for $94,225.56, citing Federal Rule Bankruptcy Procedure 3001(c)(2)(A). Claim No. 12. At first, the debtors considered curing these post-petition arrears by extending the plan term out to 84-months under temporary COVID-era plan modification rules. *See* ECF No. 105. Meanwhile, the docket reflects that the debtors also were several months behind on plan payments. ECF No. 109. At a June 21, 2022, hearing on the trustee's objection to confirmation of the proposed 84-month plan—an objection based in part on lack of feasibility or a supporting budget—counsel for the debtors proposed various solutions: ". . . A third option would be to take note that the debtors never scheduled payments for the taxes or the insurance on their original or amended budget in the plan, so in theory [Mr. Hubbard] could sign a [Form 2831] that says he complied [with the plan], and receive a discharge allowing the cramdown of the property, but the title wouldn't be clear because the debtor still would owe the roughly $94,000." ECF No. 115.[4]

Ultimately, Mr. Hubbard and Community decided to handle the arrears by rolling them into a loan modification agreement. The loan modification was to be funded in part by an anticipated $40,000 grant from Wisconsin Help for Homeowners. *See* ECF No. 122 (audio recording of Oct. 4, 2022, hearing). Counsel for the debtors stated that the loan modification would resolve the

---

[3] Language in the original promissory note sets out the debtors' obligations if the lender advances funds to protect or preserve the property, or for taxes, assessments, or insurance, *see* Claim No. 11-1, at 6 ("Default and Acceleration" provisions), while the underlying mortgage agreement provides that the lender's security interest extends to secure the repayment of "any and all additional advances made by the Lender . . . for taxes, assessments or insurance premiums," *see id.* at 17 (Article 2 – "Debt and Obligations Secured").

[4] Counsel's statement that the debtors "never scheduled payments for taxes or insurance" in their budget or plan is mistaken. As noted above, the debtors' original budget reported that they were paying a total of $890/mo. for those expenses ($233 for insurance, and $657 for property taxes). *See* ECF No. 1, at 48.

entire amount of arrears and no modified plan would be necessary. *Id.* [6] Because the Help for Homeowners grant was not finalized at that point, the parties asked the Court to adjourn the hearing once again. *Id.* The Court set an adjourned hearing date of November 22, 2022. But on November 21, the debtor withdrew his proposed plan modification as "no longer required." ECF No. 124. That same day, the Chapter 13 trustee filed his Notice of Completion of Plan.

When a Chapter 13 plan "provides for the trustee or debtor to make contractual installment payments" on "a claim that is secured by a security interest in the debtor's principal residence," the trustee typically files a Rule 3002.1 Notice of Final Cure Payment ("NOFC") after the plan completes, to document the amount the trustee paid to the mortgage creditor through the plan. *See* Fed. R. Bankr. P. 3002.1(f). Here, because none of the properties subject to Community's mortgage were the debtors' principal residence as of the petition date,[7] the trustee was not required to file a NOFC on Community's claim. Nonetheless, on December 6, 2022, the Chapter 13 trustee filed two NOFCs relating to Community's original and supplemental claim. *See* ECF Nos. 134 & 135.

On December 27, 2022, Community filed its responses to the two NOFCs, *see* ECF Nos. 139 & 140, stating that the debtors had no prepetition arrears and were current with all post-petition payments consistent with 11 U.S.C. § 1322(b)(5). Community's responses each attached a copy of the recent

---

[6] In counsel's words: "Thank you, your honor. Good morning. The modification requires a payment of $10,000 by October 5, and the $40,000 grant from Help for Homeowners fund. The signed modification is in the mail, the $10,000 is being paid today by the debtor, and then once we can show proof of that, then the Help for Homeowners folks will release the $40,000, and then I can withdraw this plan modification and file conclusion documents for this case."

[7] There is some debate over the appropriate date for determining a debtor's "principal residence" status, at least for purposes of applying the anti-modification provision of 11 U.S.C. § 1322(b)(2). *Compare, e.g., In re Abrego*, 506 B.R. 509, 515–16 (Bankr. N.D. Ill. 2014) (recognizing that a majority of courts look to the petition date, while a minority use the loan transaction date, and adopting the minority approach); *In re Hueramo*, 564 B.R. 604, 606 (Bankr. N.D. Ill. 2017) (following the majority approach and relying on the property's use as of the petition date). The record reflects that Mr. Hubbard later moved into one of the rental properties, *see* ECF No. 75, but his post-petition change of address does not alter the (in)applicability of Rule 3002.1.

loan modification agreement with the debtor.[8] In essence, the debtor converted what was otherwise a post-petition obligation under the plan into a new mortgage outside the plan. With the obligation removed, the plan could complete and the debtors could receive their discharges (which issued in December 2022).

Two and a half years later, on May 1, 2025, debtor Mr. Hubbard returned to Bankruptcy Court and filed a combined Motion to Reopen Case and Motion to Declare Secured Claim Satisfied and Lien Released. ECF No. 145. He seeks to have the Court deem the mortgage lien satisfied by operation of the completed plan and discharge, and because of Community's alleged failure to facilitate the $40,000 grant from Wisconsin Help for Homeowners. Community filed an objection to reopening and also objects to the request for declaration of satisfaction, asserting that its mortgage lien and modified loan remain valid. ECF No. 147. At a hearing held on June 4, 2025, Community asserted that no further facts were necessary for the Court to rule on the pending questions. Mr. Hubbard sought to submit certain additional facts, but the Court determined those were extraneous to the pending legal issues and took the matter under advisement.

## JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1334 and the Eastern District of Wisconsin's July 16, 1984, order of reference entered under 28 U.S.C. § 157(a). Determinations of the validity, extent, or priority of liens, and

---

[8] Mr. Hubbard signed the agreement on September 30, 2022, and Community signed on December 6, 2022. The agreement states that monthly payments on the "New Balance" of $94,225.56 will commence on November 1, 2022, with a maturity date of October 1, 2024, and further states in pertinent part:

> Due to adverse economic circumstances, Owner has requested Servicer to adjust the scheduled amortization of the Note [of July 9, 2002] to permit Owner to meet the obligations of the Loan Documents [original Note and mortgage] that are secured by the Owner's property in full and in a timely manner. . . . Owner agrees that he will not . . . (ii) create or permit to exist any lien . . . or encumbrance upon or with respect to any of the Property except for Servicer's already existing security interest and lien . . . .

ECF Nos. 139–40.

the dischargeability of particular debts, are core proceedings under 28 U.S.C. §§ 157(b)(2)(K) & (I), for which the Court may enter final orders and judgments. 28 U.S.C. § 157(b)(1).

## DISCUSSION

On motion, the Court may exercise its discretion to reopen a case "to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b); Fed. R. Bankr. P. 5010. The Seventh Circuit has identified three non-exclusive factors to weigh: (1) timeliness, or conversely, prejudice, (2) availability of an appropriate state-court forum, and (3) facial validity of the movant's underlying claim. *Redmond v. Fifth Third Bank*, 624 F.3d 793 (7th Cir. 2010). "These factors balance two realities—first, that bankruptcy courts have expertise, both in the law governing bankruptcy cases and in the details of the cases before them, and second, that bankruptcy courts are courts of limited jurisdiction that exist parallel with other, often state courts, equally capable of addressing disputes." *In re Servin*, Case No. 16-39971, 2025 WL 863298, at *2 (Bankr. N.D. Ill. Mar. 18, 2025).

### A. Timeliness

There is no bright line to say at what point a movant's delay should weigh against his or her motion. "[C]ourts may consider the lack of diligence of the party seeking to reopen and the prejudice to the nonmoving party caused by the delay." *Redmond*, 624 F.3d at 799. And certainly, "[a] debtor who has cause for reopening cannot dilly-dally." *In re Kleynerman*, 93 F.4th 1071, 1074 (7th Cir. 2024) (Easterbrook, J.). Beyond these general guidelines, the Court may look to similar cases as reference points.

The Seventh Circuit in *Kleynerman* agreed that the bankruptcy court's decision to reopen a case "70 days after the discharge's entry and 36 days after the state judge's post-discharge decision" was reasonable. 93 F.4th at 1074. But delay stretching into years has supported denial of reopening in many cases: *In re Bianucci*, 4 F.3d 526 (7th Cir. 1993) (over two years, including five months of inaction after having actual notice of a creditor's lien on the

property); *Redmond*, 624 F.3d at 799 (after seven years litigated in state court, four years after bankruptcy case closed, and three weeks before state court trial); *Hawkins v. Landmark Fin. Co.*, 727 F.2d 324 (4th Cir. 1984) (eight months after closing). The passage of time weighs even more heavily when a debtor has sat on his rights, or a creditor has expended its own resources litigating the issue in state court. *See Redmond*, 624 F.3d at 799. In this case, both circumstances occurred.

Mr. Hubbard filed this motion twenty-seven months after his case had been closed, and after Community invested nearly nine months in state court prosecuting a foreclosure action. Only after Community moved for summary judgment in state court did the debtor seek to involve the Bankruptcy Court. The debtor's counsel has argued that this Court should view the motion as timely from the debtor's perspective—that is, the motion to reopen was filed promptly after the question of lien viability came up during the foreclosure litigation. So, he argues, the debtor would have acted sooner had Community itself acted sooner to enforce its lien rights in state court.

Yet the Court cannot fault Community for delay when Community maintains that it has a valid mortgage lien on the property, and the debtor until recently had behaved as if this were true. Moreover, once the Wisconsin Help for Homeowners grant fell through, the debtor had everything necessary to present his theory that Community's lien was invalid. Mr. Hubbard would have become aware of the failed grant status shortly after the bankruptcy case concluded, given the parties' earlier representations. At that point, he was free to pursue an action in state court to quiet title or move to have this case reopened within a short time thereafter but did not. In sum, the chronology here mirrors that of *Bianucci*, and therefore the factor of timeliness weights against reopening.

### B. Availability of a State Court Forum

The *Redmond* court identified a second factor as the availability of an adequate state court forum to consider the relief sought. Given that the parties'

current foreclosure dispute is ongoing in state court, there is no doubt that an appropriate state court forum is available. The harder question is which forum is *more* appropriate. Favoring the state court is the nine months of litigation already spent in that forum. There also is no reason to think that this Court is more equipped to answer state law questions relating to contract modifications and liens than the Milwaukee County Circuit Court.

Favoring resolution in this Court, on the other hand, is that the parties' dispute seems to touch, at least in part, on topics that are core to bankruptcy: claims, reorganization plans, and discharges. While a state court is empowered and capable of construing a Chapter 13 plan, *see In re Harvey*, 213 F.3d 318, 321 (7th Cir. 2000), the Bankruptcy Court is "in the best position to interpret its own orders," including by some views, a plan the Court itself confirmed. *See In re Terrell*, 637 B.R. 129, 138 (Bankr. E.D. Wis. 2021) (Halfenger, C.J.), *rev'd on other grounds*, 39 F.4th 888 (7th Cir. 2022). That said, the passage of several years (and thousands of intervening cases) lessens the significance of this factor. At this point, the Court is working primarily from the record rather than its own vivid memory. Considering both possible fora, the availability factor ultimately weighs against reopening.

### C.   Facial Validity of the Movant's Underlying Claims

The third *Redmond* factor is the apparent strength of the debtor's underlying request to have his lien deemed satisfied and released. It would not make sense to reopen a case "to accord relief to the debtor" if no relief is available. 11 U.S.C. § 350(b); *Redmond*, 624 F.3d at 803 ("[A] closed bankruptcy proceeding should not be reopened 'where it appears that to do so would be futile and a waste of judicial resources.'").

As established above, the debtor's "inordinate" delay in seeking relief, *Bianucci*, 4 F.3d at 529, as well as the recent posture in the state court, can be overcome only with a strong showing on the merits. The debtor's theory of relief must be compelling, not merely plausible. *See Redmond*, 624 F.3d at 799 ("The longer a party waits to file a motion to reopen a closed bankruptcy case, the

more compelling the reason to reopen must be."). The debtor has not raised arguments that compel reopening.

The debtor principally relies on one non-standard line from his Chapter 13 plan: "[u]pon completion of the plan and the granting of the Debtors' discharge, the mortgage lien of Bayview Loan Servicing, LLC [Community] shall be considered satisfied." ECF No. 3, at 5.[10] According to Mr. Hubbard, when Community cleared the way for the debtors' discharges by filing its responses to the trustee's NOFCs reporting that the debtors were current on all post-petition payments—which the debtor's counsel likens to "withdrawing" Claim No. 12—Community unwittingly voided the lien securing the modified loan agreement it had just executed. Mr. Hubbard recognizes that Community did so specifically to permit the debtors to receive their discharges. But lest the Court view this as an unjust windfall to Mr. Hubbard, the debtor points out that Community may have breached its obligation under the loan modification agreement to help him obtain the $40,000 state mortgage assistance grant. ECF No. 145-2, at 2.

Beginning with the last point, the debtor apparently seeks to void the entire loan modification agreement on equitable grounds. But it would not be equitable to void the debtor's obligations while permitting him to keep the discharge he received in consideration. If Community had not agreed in good faith to modify the debtor's mortgage, the debtor's Chapter 13 case likely would have failed due to the undisputed post-petition tax and insurance arrears, and no discharge entered. Mr. Hubbard might be entitled to some remedy in state court for Community's alleged breach, if it can be shown, but total recission of the loan modification agreement would leave the debtor with an inequitable windfall.

---

[10] The Court ordinarily will construe a Chapter 13 plan "as written, give its terms their plain or ordinary meaning based on what a reasonable person in the appropriate community of bankruptcy practitioners would have understood them to mean under the relevant circumstances, and turn to extrinsic evidence or other aids to construction only to the extent necessary to discern that meaning or to resolve genuine ambiguities in the text." *Terrell*, 637 B.R. at 138 (surveying cases).

Moreover, the Court agrees broadly with the creditor's counterarguments. First, it is clear from context that the "cramdown" provision of the plan never contemplated the effective creation of a new secured obligation during the plan term, although one eventually was necessary. A cramdown under 11 U.S.C. § 1325(a)(5)(B) operates by bifurcating an undersecured claim into one fully secured claim and one unsecured claim. *See* 11 U.S.C. 506(a). Therefore, a debtor successfully completing his or her plan would satisfy the secured portion by payment in full and the unsecured portion by discharge, exiting Chapter 13 with property free and clear. The payment obligation in the loan modification agreement, entered well after the case was filed and plan confirmed, would not have been erased by the discharge. *See* 11 U.S.C. § 1328(a) (discharge applying to "all debts provided for by the plan" and not exempted by some other provision). And as for the lien securing that obligation, the parties' intent reflects that a new lien was created either explicitly or equitably.[11] So, some security interest survived the discharge even if the plan operated as the debtor imagines. *See also Enewally v. Washington Mut. Bank* (*In re Enewally*), 368 F.3d 1165, 1173 (9th Cir. 2004) (noting that while confirmed plans are *res judicata* to issues therein, the confirmed plan has no preclusive effect on issues that were not adequately evidenced in a plan to provide sufficient notice to the creditor).

Considering the debtor's representations made to induce Community into accepting modified terms, the Court also agrees with Community's arguments on judicial estoppel. In June 2022, when the subject of the post-petition arrears came up, the debtors' counsel suggested that the parties "take note that the debtors never scheduled payments for the taxes or the insurance

---

[11] An equitable lien under Wisconsin law may be recognized where there is "a debt, duty or obligation owing by one person to another," and a "res to which that obligation fastens," arising "from written contracts showing an intention to charge some particular property with the payment of a debt." *O'Connell v. O'Connell*, 2005 WI App 51, ¶ 13, 279 Wis.2d 406, 415 (citing *McIntyre v. Cox*, 68 Wis. 2d 597, 602, 229 N.W.2d 613 (1975)). *See also In re Jester,* No. BAP EO-15-002, 2015 WL 6389290, at *9 (B.A.P. 10th Cir. Oct. 22, 2015) (ruling, in a Chapter 7 case, that failure to file a proof of claim does not itself invalidate a lien, citing 11 U.S.C. section 506(d)).

on their original or amended budget in the plan, so in theory [Mr. Hubbard] could sign a [Form 2831] that says he complied [with the plan], *and receive a discharge allowing the cramdown of the property, but the title wouldn't be clear because the debtor still would owe the roughly $94,000.*" ECF No. 115. While counsel erred in saying the taxes and insurance were not part of the debtors' budget, her primary assertion that the outstanding $94,000 would cloud the property's title is a position statement recognizing that a lien survived.

Moreover, the Court held multiple adjourned hearings near the end of the case to clarify how the parties intended to resolve the mountain of arrears. *See* ECF Nos. 113, 114, 117, 119, &121. At that time, the parties were waiting for the Wisconsin Help for Homeowners grant money to come through, money that ostensibly was necessary for the loan modification to work. Several weeks later, the final scheduled hearing was canceled when counsel for the debtor withdrew the debtor's proposed modified plan and stated that "the modification is no longer necessary." ECF No. 124. The next day, the Chapter 13 trustee responded by reporting that the plan had completed. ECF No. 126. Community then filed its responses to the trustee's NOFCs, each with a copy of the executed loan modification agreement attached. ECF Nos. 139 & 140. Shortly thereafter, the debtors received their discharges. ECF Nos. 130, 141. From this Court's perspective, every party was behaving as though they believed the debtor and creditor resolved the question of arrears with a binding and effective loan agreement, and a continuing lien.

"Judicial estoppel is a matter of equitable judgment and discretion," to be applied where the Court is misled or misdirected by a change of position under circumstances which would lead to inequity. *In re Knight-Celotex LLC*, 695 F.3d 714, 721 (7th Cir. 2021). In deciding whether to apply judicial estoppel, the Court considers factors including: (1) that "a party's later position must be clearly inconsistent with its earlier position;" (2) "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled;" and (3) "the party

seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)) (cleaned up). Mr. Hubbard's representations in the latter half of 2022 left this Court with the unmistakable conclusion that the post-petition escrow arrears had been resolved by a new, binding loan agreement and lien, and it would not have issued discharges had that not been true. In contrast, the debtor's current legal position would deny Community all its rights under the loan agreement and reward the debtor with an unfair windfall. Given the perception that the Court was (or currently is being) misled by a change in position, invoking the doctrine of judicial estoppel is appropriate.

Likewise, invoking the doctrine of equitable estoppel is appropriate because Community was misled by the debtor's change in position and acted in reasonable reliance thereon. Equitable estoppel arises from state law, and in Wisconsin the general elements are: "(1) action or non-action; (2) on the part of one against whom estoppel is asserted; (3) which induces reasonable reliance thereon by the other, either in action or non-action; (4) which is to the relying party's detriment." *Pagan v. Integrity Solution Services, Inc.*, 42 F. Supp. 3d 932, 934 (E.D. Wis. 2014) (citing *Affordable Erecting, Inc. v. Neosho Trompler, Inc.*, 2006 WI 67, ¶ 33, 291 Wis. 2d 25)). Prior to discharge, Community was owed $94,000 in post-petition arrears and therefore had the ability to block plan completion. Without payment in full or Community's cooperation, the debtor would not have received a discharge and Community's lien undeniably would have remained in effect. *See* 11 U.S.C. § 1325(a)(5)(B)(i)(I). Community was persuaded to report that the debtors were current on post-petition arrears thanks to execution of the loan modification agreement, and therefore did not impose an obstacle to discharge. It would be unjust to permit a reversal of position now that Community has given up its leverage and the debtor has received his discharge.

**CONCLUSION**

Read together, the *Redmond* factors weigh against reopening this case. The debtor has not shown that this motion was timely, necessary, or likely to succeed on the merits. Therefore, the Court will deny the Motion to Reopen and decline to consider the motion for declaratory relief.

IT IS SO ORDERED.

Dated: July 18, 2025

By the Court:

Beth E. Hanan
United States Bankruptcy Judge